FILED

2013 Feb-08  PM 04:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| KAY MARSHALL and CHRIS MARSHALL, | ) ) ) | |
| Plaintiffs, | ) ) | **CIVIL ACTION NO.:** **CV# 5: 11-CV-02116- TMP** |
| v. | ) ) | |
| BANKSTON MOTOR HOMES, INC, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This cause is before the court on the motion for summary judgment filed by the defendant, Bankston Motor Homes, Inc., on April 19, 2012.  The matter has been briefed and orally argued to the court.  The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  Having considered all the pleadings and arguments of the parties, the court finds the motion for summary judgment is due to be granted.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The current version of Rule 56 still requires that the nonmoving party may not rely merely on allegations or denials in its own pleading. Rather, the nonmoving party's response must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e) provides that if a party fails to respond to a properly supported factual assertion by another party, the court may deem the fact undisputed and grant summary judgment if otherwise appropriate. "[T]he plain language of [former] Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; *see* Fed. R. Civ. P. 56(a).

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

<u>STATEMENT OF FACTS</u>

The principal business of Defendant Bankston Motor Homes, Inc. ("Bankston") is the sale of motor homes, recreational vehicles (RV), and related items. (See Plaintiffs' Complaint, Para. 2, herein described as Exhibit A).  Fred Jackson ("Jackson") is an a salesperson for Bankston, and he acted within his scope of employment throughout the times material to this case.  <u>Id</u>.  Plaintiffs Chris Marshall and (then) Kay Flugge ("Kay") contacted Bankston in early 2009 about purchasing an RV.  The plaintiffs had a home in Ohio, but also lived in Florida at times.  <u>Id</u>.  Jackson was the primary contact who dealt with the Plaintiffs.  <u>Id</u>.  From February through early March 2009, plaintiff Chris Marshall ("Chris") negotiated with Jackson for the purchase of an RV.  (See Exhibit A, Para. 3).  At that time, plaintiffs were not married, but Chris was authorized to negotiate for Kay as well as himself.  On March 9, Jackson made an offer to plaintiffs via email to sell them the RV for $258,660.00.  <u>Id</u>.  To determine whether financing for the purchase could be obtained, Chris provided Jackson with plaintiff Kay Flugge's financial information.  Chris explained to Jackson that due to past financial problems and bankruptcies by Chris, the financing would need to be arranged in Kay's name and based on her credit worthiness.  (Depo. of Kay Marshall, p. 47).  Although Chris was unemployed on disability, Kay was employed.  Also, plaintiffs explained to Jackson that financing for the purchase would need to be approved before May 15, 2009, because of Kay anticipated taking early retirement on that date.  They were concerned that due to her early retirement, she would not have a salary, making credit approval more difficult.  Jackson told Chris that financing for the purchase would likely be approved and should not be a problem getting approval before May 15.  <u>Id</u>.

On March 15, 2009, after their discussions with Jackson, Kay received a letter explaining that financing by the Bank of the West had not been approved.  (See Exhibit A, Para. 6).  Jackson told Chris that he knew somebody and would be able to get financing approved for the plaintiffs' purchase of the RV.  Id.  Plaintiffs again communicated to Jackson that financing must be approved by May 15.  (See Exhibit A, Para. 7).

Around this time, Kay gave notice to her employer that she intended to take early retirement beginning on May 15, 2009.  (See Exhibit A, Para. 4).  Plaintiffs also decided to marry around this time; thus, Kay Flugge became Kay Marshall on March 16, 2009,[1] when they married.  Id.   By marrying Chris, Kay also gave up alimony payments she was receiving from her ex-husband.

On March 30, Bank of America approved a financing arrangement for Kay in the amount of $218,660.00  (See Defendants' Exhibit 5), and Jackson notified the plaintiffs that he had succeeded in finding someone willing to provide financing for the purchase.  Chris instructed Jackson to email the purchase contract to them, and the next day, Kay signed the Purchase Agreement ("Agreement") for the RV on March 31, 2009.  (See Defendants' Exhibit 2).  There was a $5,000 down payment paid using Kay's credit card.  (See Exhibit A, Para. 6).  On April 2, Bank of America approved a financing arrangement for Kay in the increased amount of $235,198.30.  (See Defendants' Exhibit 6).  The credit approval was guaranteed only for a period of 60 days, however.  Although Bankston received notice of the credit approval, neither Kay nor Chris saw the credit-approval letters from

---

[1]  The marriage occurred the day *after* plaintiffs were notified that the Bank of the West had rejected their credit application.

Bank of America. (Depo. of Chris Marshall, Doc. 15-4, p. 30). Chris was aware, however, that the credit approval was good only to the end of May.[2]

By its express terms, the Purchase Agreement called for Kay to purchase and Bankston to sell a 2009 Allegro Bus RV to be custom built by Tiffin Motorhomes. The Purchase Agreement stated immediately above Kay's signature that, "This agreement contains the entire understanding between you [seller] and me [buyer] and no other representation or inducement, verbal or written, has been made which is not written in this contract."[3] (Defendant's Ex. B, Doc. 15-2). It did not specify a time for closing or completion of the purchase, except in Paragraph 6, "FAILURE TO COMPLETE PURCHASE," in which it is stated that, "If I [the purchaser] fail or refuse to complete this purchase within the time frame specified, by the agreed upon terms of this contract or as specified in the Uniform Commercial Code of the state of your [the seller] jurisdiction..." the seller may offset losses or expenses from the purchaser's down payment and trade-in. (Defendant's Ex. B, Doc. 15-2, p. 2, ¶ 6). Additionally, the contract provided that, "I [buyer] will not hold you [seller] liable for delays, [sic] caused by the manufacturer, accidents, strikes, fires, or any other cause beyond your control." (Defendant's Ex. B, Doc. 15-2, p. 2, ¶ 8).

In anticipation of purchasing the RV, plaintiffs bought certain equipment and related accessories for it. They purchased a satellite system on April 8, 2009, in the amount of $2,141.50. (See Exhibit A, Para. 8). On April 17, plaintiffs bought a Mercury Mariner automobile that could be towed behind the RV for the amount of $24,127.22. (See Exhibit A, Para. 9). That same day,

---

[2] Chris testified in his deposition, "Fred was told up front that the agreement was only good until the end of May, and I told him that." (Depo. of Chris Marshall, Doc. 15-4, p. 35).

[3] The Purchase Agreement also defines the term "me" to the refer to the purchaser, Kay Flugge, and the term "you" to refer to the "dealer," defendant Bankston.

plaintiffs purchased a towing hitch and brake system, with installation, for the combined amount of $1,704.87.  Id.

On May 15, 2009, Kay took her early retirement.  (See Exhibit A, Para. 10).

On June 2, 2009, the financing agreement with Bank of America expired.  (See Defendants' Exhibit 6).  Other than working with Jackson and Bankston, plaintiffs made no independent attempts of their own to secure a financing arrangement to purchase the RV.  (Depo. of Kay Marshall, Doc. 15-3, pp. 25-26 of 64).

On June 16, Plaintiffs drove from their home in Ohio to Bankston's dealership in Huntsville to finalize the transaction and pick up the RV.  (See Exhibit A, Para. 11).  The day before they left, Chris called Jackson to advise him that they would arrive at 10:00 a.m. the next morning.  Upon arrival, plaintiffs were told that the RV was not yet ready for pickup and to come back at 2:00 p.m. (See Depo. of Kay Marshall, p. 95).  Later in the afternoon, Jackson informed plaintiffs that there was a "glitch" with the financing and that they needed to come inside to discuss it.  (Depo. of Chris Marshall, p. 64).  Sonie Alexander ("Alexander"), Bankston's business manager, told plaintiffs that she had tried all day to get a financing agreement approved, but was unable to do so.  (See Exhibit A, Para. 11).  Bankston's owner, Harrison Bankston ("Harrison"), told Plaintiffs to come back on the morning of June 17, and they would try again to secure a financing agreement.  (See Exhibit A, Para. 12).  That morning, they tried again but to no avail.  Id.  The Bank of America associate told Bankston and plaintiffs that their original financing agreement should not have been approved the first time in March and April.  (See Kay's answer to No. 8 of Bankston's Interrogatories).  Bankston refunded plaintiffs their $5,000 down payment, the cost of the satellite system, and hotel for their stay in Huntsville.  Id.

<u>DISCUSSION</u>

Plaintiffs filed a complaint asserting claims against Bankston for breach of contract, negligence, wantonness, and fraud.  They claim a contract between them and Bankston was wrongfully breached by the defendant; a duty between them and defendant was negligently breached by the defendant from which damages resulted; a duty between them and defendant was wantonly breached; and fraud was committed on part of the defendant in its dealings with the plaintiffs.  A Motion of Summary Judgment was timely filed by defendant which was supported by deposition transcripts of Chris and Kay Marshall and other exhibits.  The defendant seeks summary judgment and dismissal of this action, contending that there is no substantial evidence that defendant is guilty of breach of contract with regard to the plaintiffs' attempted purchase of the motor home; plaintiffs have produced no evidence that Bankston was in any way negligent and/or wanton; and plaintiffs have failed to establish the elements of fraud.

**A. Breach of Contract Claim**

Defendant alleges that the plaintiffs have failed to satisfy the elements of a breach of contract claim.  "A plaintiff can establish a breach of contract claim by showing (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's own non-performance, and (4) damages." <u>State Farm Fire & Cas. Co. v. Slade</u>, 747 So.2d 293, 303 (Ala. 1999); <u>Compass Bank v. Snow</u>, 823 So.2d 667, 676 (Ala. 2001); <u>Reynolds Metals Co. v. Hill</u>, 825 So.2d 100, 105-06 (Ala. 2002).  To prevail, the plaintiffs must show some evidence that a binding contract was entered into and a material portion of that contract was not performed by the defendant.

Plaintiffs seem to advance two distinct arguments in support of their breach of contract claim. First, they contend that Bankston, through Jackson or one or more of its other agents or employees, entered into a contract with the plaintiffs for their purchase of the RV, and then breached that contract by failing to secure adequate credit financing to enable plaintiffs to make the purchase. It is unclear whether plaintiffs contend the contract allegedly breached was the written purchase agreement signed by Kay on March 31, 2009, or some oral modification of the agreement. They also seem to assert that Bankston entered into an "implied" contract to secure financing for plaintiffs, which it breached. Plaintiffs assert that a material aspect of their contract was that Bankston would secure or obtain financing for the plaintiffs' purchase of the RV, and that Bankston breached its contract with the Plaintiffs by not securing or obtaining financing for the purchase of the RV. Plaintiffs claim the following damages: Kay's loss of income from her employment which otherwise would not have occurred; lost alimony payments Kay received from her ex-spouse which ceased once Kay married Chris; funds expended in order to: (a) purchase a screen for a swimming pool at Plaintiffs' residence, (b) advertise their home as rentable by vacationers, (c) purchase a satellite system for the RV, (d) purchase a vehicle that could be towed by the RV, (e) subscribe to a camping service, (f) purchase and install a towing hitch and brake system for the RV, and (g) purchase sundries for the RV; withdrawal of pension funds by Kay upon her early retirement, resulting in penalties and other costs; insurance purchased for the Mercury Mariner and RV; mental anguish and emotional distress; and other consequential damages.

Defendant, in its motion for summary judgment, argues that the only agreement entered into between plaintiffs and defendant was the written Purchase Agreement executed by Kay on March 31,

2009.[4]  It is undisputed that the Purchase Agreement was a valid contract under Alabama law.  The Agreement, however, does not provide that Bankston would secure financing for the purchase of the RV.  No language or provision in the Agreement requires Bankston to secure financing for the plaintiffs; indeed, the Agreement never speaks of financing or credit at all.  Absent some express language to the contrary, it is ordinarily the responsibility of the buyer to secure his own credit financing if needed to complete the purchase.  The nature of the seller/buyer relationship puts the obligation on the purchaser, not the seller, to assure that the purchaser has sufficient funds (through credit or otherwise) to complete the purchase he has contracted for.  If any breach of the signed Purchase Agreement occurred, it was when Kay, the purchaser under the Agreement, failed to complete the purchase by paying for the RV she agreed to buy.

To the extent the plaintiffs contend that Jackson, through his telephone conversations with Chris, orally modified or supplemented the Purchase Agreement by agreeing to obtain financing for the plaintiffs, the merger clause in the Purchase Agreement and the Uniform Commercial Code Statute of Frauds preclude the argument.  At the outset, it is clear that the Purchase Agreement comes within the Uniform Commercial Code Statute of Frauds found at Alabama Code §7-2-201, which requires:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

---

[4]  It should be noted here that Chris Marshall was never a party to the Purchase Agreement. It was a contract only between Kay and Bankston.  Thus, only Kay has a potential claim for breach of contract.  Chris does not have such a claim because he never contracted with anyone over the purchase of the RV.

See also Johnny Ray Sports, Inc. v. Wachovia Bank, 982 So. 2d 1067, 1071 (Ala. 2007).  The Purchase Agreement was for the sale and purchase of "goods" in the form of a recreational vehicle and for a price greater than $500.00.  Although the Purchase Agreement constituted the "writing" required, it did not include any provision obligating the seller, Bankston, to arrange financing for the plaintiffs.  Parties to a contract are not allowed to offer parole evidence to contradict the written terms of the Purchase Agreement, see Alabama Code § 7-2-202.  They may, however, offer evidence to explain or supplement the written agreement with (1) evidence of "course of dealing or usage of trade," or (2) "evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."  Id.  Neither of these exceptions apply.

Under the latter provision, the express merger clause in the Purchaser Agreement makes clear that it was intended by the parties to be the complete and exclusive statement of the terms of the agreement.  Thus, plaintiffs may not offer parole evidence of "consistent additional terms."  The express terms of the Agreement stated in part that, "This agreement contains the entire understanding between you and me and no other representation or inducement, verbal or written, has been made which is not written in this contract."  It is obvious that any purported modification, explanation, or supplementation of the original written contract must be in writing in order to satisfy the Statute of Frauds.  Terms of a contract cannot "be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."  Alabama Code § 7-2-202 (1975).  In interpreting the terms of the written agreement, "a valid, written instrument cannot be varied or contradicted by parol evidence."  Slaton v. Shell, 398 So. 2d 311, 312 (Ala. Civ. App. 1981); Redmond v. Harrelson, 355 So. 2d 356, 358 (Ala. 1978).  Thus, because this contract expressly provided that it contained all of

the terms and conditions of the agreement, and that no other representations or inducements were made, the second exception stated in § 7-2-202 does not apply.

Nor can plaintiffs show that the "course of dealing" between them and Bankston supplies evidence of supplemental terms to the contract.  Alabama Code § 7-1-303 defines the term "course of dealing" as "a sequence of conduct concerning *previous transactions* between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." (Italics added).  There is no evidence of "previous transactions" between plaintiff and Bankston from which a "course of dealing" can be inferred.  Likewise, there is no evidence that it is a "usage of trade" for an RV dealer to contract with the purchaser to arrange credit financing for the purchaser.  Even if dealers ordinarily assist purchasers in locating and applying for credit financing, such a service is incidental to the purchase contract, not a contractual provision upon which a breach of contract action can be founded.  As indicated above, it is the purchaser's obligation to make sure that he can complete the purchase by arranging whatever credit he may need to do so.  It is not the seller's contractual obligation to arrange the purchaser's financing.  It would be an absurd anomaly to allow a purchaser with bad credit to sue a seller for breach of contract simply because the seller could not obtain credit for the purchaser due to his bad credit.

Therefore, testimonial evidence showing the Purchase Agreement was modified or supplemented by an oral agreement will not be admitted to alter the written contract.  The only modification the plaintiffs claim would be an oral modification and therefore unenforceable under the UCC Statute of Frauds adopted in Alabama.

Along a similar vein, plaintiffs contend that the parties "impliedly" agreed that a term of the Purchase Agreement involved completing the purchase in time to take advantage of the financing approved by the Bank of America.  This argument fails for the same reason as the former, the merger clause does not allow reliance on terms and conditions not stated in the written contract.

On March 30, 2009, after the plaintiffs had been denied credit by the Bank of the West, Jackson called Chris Marshall and told him that he had located another financing arrangement, apparently referring to the credit approval from the Bank of American dated March 30.  Based on that information, Chris told Jackson that he and Kay wanted to proceed with the purchase of the selected RV.  Jackson forwarded the Purchase Agreement to them, and Kay signed it as the purchaser on March 31, 2009.  Plaintiffs contend that implied in the Purchase Agreement the parties executed was the condition that the sale be completed subject to and in a manner that the financing arrangement would be available to be used by the plaintiffs to make the purchase. Plaintiffs, in their Opposition to the Defendant's Motion for Summary Judgment, argue that there existed a contract implied in fact between plaintiffs and Bankston that the deal must be finalized no more than 60 days after April 2, in other words, by June 2, 2009, due to the 60-day limit on the Bank of America approval for credit.

A contract may be formed either expressly or impliedly.  The Purchase Agreement signed by both parties is an example of an express contract.  There are two types of implied contracts: those implied in law and those implied in fact.  Green v. Hospital Bldg. Authority of City of Bessemer, 318 So. 2d 701, 704 (Ala. 1975).  For contracts implied in law, the law fictitiously supplies the promise in order to prevent manifest injustice or unjust enrichment.  Id.  A contract implied in fact involves a meeting of the minds with non-verbal conduct.  Baltimore & Ohio R. Co.v. United States, 261 U.S.

13

592 (1923).  Plaintiffs argue that a non-verbal contract implied in fact was formed when they signed

the Purchase Agreement on the basis of Jackson's information that Bank of America had approved

credit for them.   Even though they deny they ever saw the credit approval letters, they contend that

the Agreement to purchase the RV contained an implied provision that they would do so based on

the credit Jackson arranged.  Plaintiffs claim, in essence, there was a "meeting of the minds" between

them and Bankston that the deal must be finalized before that credit arrangement expired, and

Bankston breached this implied condition by failing to complete the sale before June 2.

The problem with this argument is that the merger clause in the Purchase Agreement

prohibits extrinsic proof about any implied or oral agreement requiring completion of the sale under

the terms of the financing agreement.  As noted above, the written Purchase Agreement contains no

provision either setting a deadline for completion of the transaction or making it subject to the

financing approved by the Bank of America.   A merger clause operates to "merge" all prior

negotiations and representations into the written contract, and extrinsic evidence may not be offered

to prove other, additional terms and conditions not stated in the instrument.  The Alabama Supreme

Court has elucidated the operation of merger clauses this way:

> A "merger clause" is "a clause which states that all oral representations or
> agreements are merged into and subsumed by the written document of which the
> clause is a part." Sunchase Apartments v. Sunbelt Serv. Corp., 596 So. 2d 119, 122
> (Fla.Dist.Ct.App. 1992). "A merger clause operates only to establish that a written
> agreement is a completely integrated document, into which all *prior and
> contemporaneous negotiations* are merged." Crimson Indus., Inc. v. Kirkland, 736
> So. 2d 597, 601 (Ala.1999).  When a contract is integrated, "no extrinsic evidence
> of prior or contemporaneous agreements will be admissible to change, alter, or
> contradict the contractual writing." Sherman v. Woerner Magnolia Farms, Inc., 565
> So. 2d 601, 605 (Ala.1990). The merger rule applies as well to prior or
> contemporaneous *writings* as to oral agreements.  Palm Harbor, supra; Infiniti of
> Mobile, Inc. v. Office, 727 So. 2d 42 (Ala.1999); Ex parte Conference America, Inc.,

713 So. 2d 953 (Ala.1998); Crown Pontiac, Inc. v. McCarrell, 695 So. 2d 615 (Ala. 1997); see also Lakehead Pipe Line Co. v. Investment Advisors, Inc., 900 F.Supp. 234 (D.Minn. 1995).

Belmont Homes, Inc. v. Law, 841 So. 2d 237, 240-41 (Ala. 2002).  Similarly, in Feil v. Wittern Group, Inc., 784 So. 2d 302 (Ala. Civ. App. 2000), the Alabama Court of Civil Appeals affirmed the entry of summary judgment on a breach of contract claim where a merger clause in a sales contract precluded evidence of oral representations made at the time the contract was signed.  The court wrote:

> Merger clauses are enforceable under state contract law and have been given effect in Alabama for years.  Crown Pontiac, Inc. v. McCarrell, 695 So. 2d 615 (Ala. 1997). "While merger clauses do not bar parol evidence of fraud in the inducement of contracts, they are properly used to ensure that preliminary negotiations, whether oral or written[,] are either memorialized in the final contract or are not considered part of it."  Id., at 618 (citation omitted); see also Infiniti of Mobile, Inc. v. Office, 727 So. 2d 42 (Ala.1999).  Further, a person who signs a contract is on notice of those terms contained in the contract and is bound by those terms.  Power Equipment Co. v. First Alabama Bank, 585 So. 2d 1291 (Ala.1991).

Id. at 309.

Applied to the instant case, evidence that Jackson and Chris Marshall discussed the necessity of completing the purchase and financing of the purchase by a certain date or time period cannot be offered to alter the terms and conditions of the written Purchase Agreement because it contains a merger clause.  Preliminary negotiations or representations about financing, if any, must be reflected in the written provisions of the contract in order to be merged into it.  Their absence from the written provisions of the contract cannot be altered or supplemented by parole evidence.  While it is true that Jackson represented, truthfully, to Chris that another financing arrangement had been found and that

representation caused Kay to proceed with signing the Purchase Agreement, neither the terms and conditions of the financing arrangement nor any time limitation applicable to it were added to the provisions of the written Purchase Agreement.  There was no apparent attempt to add to the Purchase Agreement that the sale transaction had to be completed by a certain date or within a certain time period.  Therefore, with the merger clause in the Agreement, any preliminary negotiations or representations not "memorialized in the final contract... are not considered part of it."  Feil v. Wittern Group, Inc., 784 So. 2d 302, 309 (Ala. Civ. App. 2000).  Consequently, Bankston was under no contractual obligation to complete the transaction within any particular time frame so as to assure that the financing arrangement with the Bank of America remained available to the plaintiffs.[5] Failure to complete the transaction before the arrangement expired was not a breach of the written Purchase Agreement.

More broadly, even assuming some non-verbal agreement was reached under which Bankston would attempt to secure financing for the plaintiffs after the Bank of America approval expired, it is clear that Bankston fulfilled any contractual duty to use reasonable efforts to secure it.  Plaintiffs do not assert that Bankston contract to provide the financing itself, only that it would arrange financing with a bank or other third-party.  Defendant could not guarantee that financing, in fact, could be secured.  This depended upon the credit worthiness of Kay Marshall as measured by creditors.  All Bankston could promise was to use reasonable efforts to secure financing, and there

---

[5]  It can be observed as a common sense notion of commerce that Bankston was every bit as anxious as the plaintiffs to complete the transaction in a manner allowing the plaintiffs to buy the RV.  As a seller of RVs, Bankston wanted the transaction to go through.  That's how it made its money.  There is no reason to believe that Bankston intentionally delayed the completion of the transaction in order to deprive the plaintiffs of financing.  Its commercial interests were just the opposite.

is no dispute that it did so by seeking financing for the plaintiffs on multiple occasions.  It was the poor credit worthiness of the plaintiffs that prevented it, not the failure of Bankston to seek it.  Thus, Bankston did not breach any implied agreement to seek financing for the plaintiffs, even if one can be considered outside the written terms of the Purchase Agreement.

In sum, Bankston did not breach any contractual duty to the plaintiffs.  The written Purchase Agreement signed by them contains neither a provision obligating defendant to secure credit financing for them or to complete the sale transaction within a certain period of time. Further, even if one can find such a contractual duty, Bankston fulfilled it by securing credit for the plaintiffs from Bank of America.  That the credit arrangement expired before the sale was completed is not a breach of any duty to secure financing.  Bankston is entitled to summary judgment on the plaintiffs' breach of contract claim.

### B. Negligence Claim

Defendant, in its motion for summary judgment, claims it had no legal duty to the plaintiffs to use reasonable care or ordinary care in obtaining, securing, or otherwise providing appropriate financing for their purchase of the RV, and if any duty did exist, it would be a contractual duty and not actionable in tort.  "In a negligence action the plaintiff must prove (1) that the defendant owed the plaintiff a duty under law; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury." DiBiasi v. Joe Wheeler Electric Membership Corp., 988 So. 2d 454, 460 (Ala. 2008); Ford Motor Co. v. Burdeshaw, 661 So. 2d 236, 238 (Ala. 1995).  The defendant must be subject to a legal duty owed to the plaintiff for a plaintiff to maintain an action in negligence. DiBiase at 460.  In the present case, plaintiffs allege that the defendant had a legal duty to obtain or

secure financing for the plaintiffs for the purchase of the RV and, additionally, defendant had a legal duty to disclose to plaintiffs prior to June 16 that it had not obtained or secured financing.  Plaintiffs go on to argue that this inability to obtain or secure financing or to disclose to plaintiffs that it had not done so was the proximate cause of plaintiffs' damages.

Plaintiffs' argument falls flat at the outset because if there was any duty owed by the defendant to the plaintiffs, it would be a contractual duty, not a duty sounding in tort.  "It will be observed that a negligent failure to perform a contract, express or implied, is but a breach of contract.  But if in performing it, it is alleged that the defendant negligently caused personal injury or property damage to plaintiff, the remedy is in tort."  Vines v. Crescent Transit Co., 85 So. 2d 436, 440 (Ala. 1956).  There must be some public duty that was breached to have basis in a negligence claim.  Id.  In the present case, there is no duty imposed by law requiring Bankston as the seller of an RV to obtain or secure financing for the RV.  Nor is there a public duty for Bankston to disclose to Plaintiffs that it did not obtain or secure financing.  If any duty existed, it was pursuant to a contractual agreement between the parties, which, as discussed above, cannot be enforced under the written merger clause.  "A mere failure to perform a contract obligation is not a tort."  C&C Products, Inc. v. Premier Ind. Corp., 275 So.2d 124, 130 (Ala. 1972).  This is all assuming that Bankston failed to secure or obtain financing for the plaintiffs even though the evidence is clear that financing was obtained by defendant on behalf of the plaintiffs on March 30, 2009, and again on April 2, 2009.  Therefore, if any duty was owed to the plaintiffs by the defendant, even though the evidence shows no duty was owed, then that duty would only have a basis in an action for breach of contract rather than an action in negligence.

### C. Wantonness Claim

Defendant argues in its motion for summary judgment that the plaintiffs have produced no evidence, and that none exists, that shows Bankston was in any way wanton.  Defendant further asserts that if any evidence exists, it would establish a breach-of-contract claim rather than a wantonness claim. Plaintiffs argue defendant consciously engaged in acts or omissions that caused them harm by not obtaining or securing financing for the RV and not disclosing to the plaintiffs that it had not obtained or secured financing for the RV.

For plaintiffs to establish an action in wantonness, they must offer substantial evidence that Bankston acted with reckless indifference to the consequences by consciously or intentionally doing some wrongful act or omitting some known duty and that act or omission injured the plaintiff. Braden Furniture Co., Inc. v. Union State Bank, 2012 WL 5077221 (Ala. 2012).  To be actionable, the act or omission must proximately cause the injury of which the plaintiff complains.  Martin v. Hodges Chapel, LLC, 89 So.3d 756, 764 (Ala. Civ. App. 2011).  Plaintiffs contend here that Bankston recklessly and consciously refused to obtain financing for their purchase of the RV, and/or deliberately and consciously failed to disclose to them that they had failed to do so.  If anything, however, these are duties that would arise only by way of a contract.  There is no duty imposed by law requiring a seller to arranging financing for purchasers, nor is there a duty to disclose a failure to do so.

Moreover, even if such duties existed, Bankston did not act recklessly with respect to them. According to the evidence, the plaintiffs were told every step of the way, either by defendant or Bank of the West, whether or not they were approved for a loan.  On March 15, Plaintiffs received a letter from Bank of the West that informed them that their loan was not approved.  Days later, Jackson told

Chris that he would be able to get a loan for them from another financing agency. That statement was true. On March 30, defendant received word that Bank of America had approved a financing agreement for plaintiffs, and this was communicated to the plaintiffs by defendant. On April 2, another loan was approved by Bank of America for the plaintiffs. Although that approval expired on June 2, Bankston continued to make multiple efforts to obtain the needed financing because it too wanted the sales transaction to be completed. On June 16, defendant was unable to get a loan re-approved on behalf of plaintiffs from Bank of America, and this as well, was communicated to the plaintiffs. There simply is no evidence that Bankston recklessly disregarded any duty (which did not exist) to assist in arranging financing.

"Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness that the doing or not doing of some act will likely result in injury." Smith v. Davis, 599 So. 2d 586, 588. Wantonness must be shown by substantial evidence. Id; Ala. Code § 12-21-12 (1975). Plaintiffs have not presented evidence substantial enough to meet the wantonness standard. To meet the standard, Plaintiffs would have to show that Defendant consciously or intentionally misinformed them of the state of their financing situation. Plaintiffs have provided little to no evidence that Defendant provided misinformation in any respect, much less that Defendant recklessly provided misinformation. Bankston is entitled to summary judgment on this claim also.

**D. Fraud Claim**

The focus of the plaintiffs' fraud claims is a statement made by Jackson to Chris Marshall, indicating that plaintiffs should not worry whether financing would be available for the transaction. Viewing the evidence favorably to the plaintiffs, the evidence indicates that Chris Marshall told

20

Jackson in late March that he and Kay could not proceed with buying an RV without creditor financing.  Although Jackson then obtain credit approval from Bank of America, Chris expressed concern that the credit transaction had to be completed before the end of May.  Jackson replied, "Don't worry about it.  Don't worry about it."  Chris Marshall's testimony on this is reflected in the following, taken from his deposition:

> Q:     The date on this contract, Chris, or the date that appears by her [Kay's] signature is March 31st, 2009?
>
> A:     Okay.
>
> Q:     Is it your recollection of when this was signed?
>
> A:     Yes.  Had to be.
>
> Q:     That was —
>
> A:     Well, should have been.  Sure.
>
> Q:     If that is it, is this the date that you called and told Fred [Jackson] I'm going to go through with it, send me a contract?
>
> A:     No.
>
> Q:     Tell me about that.
>
> A:     Fred couldn't get a loan.
>
> Q:     Okay.
>
> A:     And this is when everything — I just went, you known, we're screwed on this deal because Fred was saying — I gave him all the scenario on what was going on with me and everything.  It was all going to have to be through Kay.  Well, he got the decision where we weren't going to get it, and then he gave me a phone call like a day late [sic] two days later, I don't know when it was, that he found somebody who was going to go ahead and finance us.  So, I go okay, that's great.  That is how it all started.  So, you know, we're going

this is great.  We went up and got married.  You know what, we went up and got married.  Came back.  She signed everything then.  Had to be all that way.  So, we started making plans at that point on what we were going to have to do.

* * *

Q:   And you think at some point shortly thereafter he calls and says we have somebody who will do it?

A:   Yes, sir.

Q:   Do you know if it is this Bank of America?  Do you recall either way?

A:   No, sir.  I never remember seeing anybody saying we were approved.  Going on Fred's word, you know.  That is who I was talking with all the time.

Q:   Did you see these letters where Bank of America told Bankston you were approved?

A:   No.

Q:   Look at Exhibit Numbers 6 and 5.  Have you ever seen these before?

A:   (Witness perusing documents.)   Not that I — no.   Not that I remember.  I didn't know who they were financing it through.

Q:   At any rate, I'm assuming at some point Fred communicated to you that you or Kay were in fact approved?

A:   Yes.

Q:   Do you remember when that was?

A:   I said like a few days after he said we were disapproved and didn't get approval.  And then he said, Hey, I found someone that is going to approve you.  That is when we started making all the plans.

* * *

22

Q:    I asked you wife this question.  I want to ask you this question.  Is it part of your lawsuit that you think Bankston lied to you or is it you just don't like what happened and the way it was handled?

A:    I don't like taking my horse all the way to the trough and not being able to get my water whenever I'm being told, Hey, everything is being done, this is what we're doing.  I'm relating to Fred all the way through this whole procedure, letting him know up front.  I am not BS-ing with him.  I am telling him my situation and bankruptcies.  I'm not going to have this thing fall through and them come up and go you weren't telling us the truth.  How were you going to do this?  You had bankruptcies.  I let Fred know.  I let Bankston, who Fred represents Bankston and their financial people, through Fred, what was going on.  I wasn't lying to them.  I let them know up front.  We went through a lot of hoops to end up for her to retire and us to start traveling as to where we could do this.  Cost a lot of money.  Cost her — in order for us to live, that is why we're drawing out the rest of her retirement.

Q:    Okay.

A:    Bankston has put us into real hardship.

Q:    Here is what I want to know.  Do you claim they lied to you, Bankston?

A:    *Fred was told up front that the agreement was only good until the end of May, and I told him that.*  It was written on — it's on their forms.  Right here.  (Witness indicating.)  Says only good until June 2nd.  Okay.

Q:    Okay.

A:    *On one of the forms that we have lost out of the computer, Fred had written or somebody had written up on one the contracts it was only good to the end of May, and I told Fred that.  Fred is going, Don't worry about it.  Don't worry about it.*  Okay, so put that out of my mind because Fred says don't worry about it. ...  So, Fred, yes, that part of it, yeah, Fred did not do his job and Bankston sure didn't do his job.  Okay.  Go ahead.

Q:    You have answered the question.  I'm assuming by your answer you believe Fred lied to you?

A:    Well, he didn't do his job.

Q:    Okay.  And I'm distinguishing between to [sic] two, obviously.  But what I'm wanting to know —

A:    What is a lie and what is not doing your job?

Q:    A lie is when you intentionally tell somebody something that is not true.

A:    Okay.

Q:    It's [sic] doesn't really sound like you're accusing him of that.  You just think he should have done a better job.  You tell me.

A:    As a customer — let me throw it back on you.  If you see something on a contract that you're doing and point it out to your client and they don't pay any attention to it because it has to be done a certain time and they don't do it, guess what, they just got screwed.  I'm doing the same thing with Bankston and letting them knw ahead of time that we have got a problem because if it's not done, she's not going to get any financing because we have to go through the whole rigamarole again.  That is actually what happened.

(Depo. of Chris Marshall, Doc. 15-4, pp. 25-37) (Italics added).

From this testimony certain undisputed facts can be gleaned.  Although Chris never saw the credit-approval letters from Bank of America, Jackson told him about them, indicating that credit had been approved for a period of 60 days.  When Chris emphasized to Jackson that the transaction had to be completed by the end of May because the credit approval would expired on June 2, Jackson replied, "Don't worry about it.  Don't worry about it."  Nevertheless, this testimony also makes clear that, at the time Jackson represented to Chris that he had found someone to finance the purchase, this representation was true — Bank of America had approved financing, and both Jackson and Chris were aware of the 60-day time limit.

24

In their complaint, Plaintiffs allege claims of fraud and misrepresentation pursuant to Alabama Code §§ 6-5-100 through 6-5-104 (1975), and they reassert these claims in their opposition to the defendant's motion for summary judgment.  They contend that defendant, through Jackson, misrepresented to them that it would obtain or secure financing for the purchase of the RV and that the misrepresentations were made either (a) willfully to deceive, (b) recklessly without knowledge, or (c) mistakenly and innocently, constituting legal fraud under Alabama Code § 6-5-101 (1975). Plaintiffs also argue the suppression of one or more of the material facts by Bankston constitutes legal fraud under Alabama Code § 6-5-102 (1975).  Next, they also assert that defendant willfully misrepresented one or more material facts to the plaintiffs in order to induce them to act, and upon which they did act to their injury.  They argue these acts or omissions constitute legal fraud under Alabama Code § 6-5-103 (1975).  Finally, plaintiffs argue that Bankston willfully deceived the plaintiffs with the intention to induce them to purchase the RV when appropriate financing was not obtained or secured.  This would constitute legal fraud under Alabama Code § 6-5-104 (1975).

Plaintiffs admitted in their depositions they do not feel Defendant lied to them in dealing with their financing situation.  Indeed, the undisputed evidence taken from their own testimony shows that the representation made by Jackson that he had found someone to finance the plaintiffs' purchase of the RV was true.  That statement was made to Chris before Kay had signed the Purchase Agreement and before the plaintiffs had taken any steps or incurred any costs in relation to a proposed purchase.  While it is true that Jackson's statement induced the plaintiffs to sign the Purchase Agreement for the RV, the representation was truthful, not deceitful, and not a misrepresentation.  Therefore, allegations pursuant to Alabama Code § 6-5-103 and 6-5-104 (1975) have no evidence supporting them.  Rather, there is only evidence to the contrary.  A common

element for both § 6-5-103 and § 6-5-104 is a willful *misrepresentation* (emphasis added), that is, a false statement of a material fact. There is no evidence to suggest that defendant misrepresented plaintiffs' financing capabilities or that credit approval was, in fact, obtained in late March. Plaintiffs were truthfully informed that credit financing had been approved, and they made the decision at that time to proceed with the purchase.

The same is true with respect to plaintiffs' claims under Alabama Code § 6-5-101 (1975), which states: "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." The only way the allegations surrounding § 6-5-101 can stand is if the defendant misrepresented a material fact either willfully to deceive, or recklessly without knowledge, or innocently. Every time defendant Bankston made a statement to the plaintiffs regarding the financing situation, however, the facts have shown the statements to be true, and not a "misrepresentation." Defendant did, in fact, secure a financing agreement from Bank of America on behalf of Plaintiff on March 30, 2009, and again on April 2, 2009.

"The elements of fraudulent misrepresentation are (1) a misrepresentation of a material fact (2) made either innocently, or willfully to deceive, or recklessly without knowledge, (3) which under the circumstances was justifiably relied upon by the plaintiff and (4) which caused injury as a proximate consequence." Appling v. Consumers Life Ins. Co. of North Carolina, 623 So.2d 1094, 1097-98 (Ala. 1993) (overruled on other grounds). This is codified by Alabama in Ala. Code § 6-5-101 (1975). To succeed in court, fraud must be clearly and satisfactorily proven. Lamb v. Opelika Production Credit Ass'n, 367 So.2d 957, 960 (Ala. 1979). The misrepresentation which plaintiffs claim the defendant made is that they had secured financing for the purchase of an RV when, in fact,

there was no financing.  However, Chris Marshall's testimony is clear that, before Kay signed the Purchase Agreement, Jackson correctly and truthfully told Chris that financing had been approved by Bank of America.  At every point where plaintiffs inquired into their loan status, the answer the defendant provided was always correct.  There is no misrepresentation at all, which means there can be no fraud under § 6-5-101.

Insofar as plaintiffs argue that Jackson's reply of "Don't worry about it," when plaintiffs emphasized that the transaction had to be completed "by the end of May" constitutes a misrepresentation, such is not a statement concerning a presently existing fact.  To be an actionable fraud in Alabama, the misrepresentation must concern a material *existing* fact, not a mere opinion or prediction about a fact or event in the future.  The Alabama Supreme Court has stated the rule as follows:

> This Court has stated that "[a] mere statement of opinion or prediction as to events to occur in the future is not a statement of a 'material fact' upon which individuals have the right to rely and, therefore, it will not support a fraud claim." *Crowne Invs., Inc. v. Bryant,* 638 So. 2d 873, 877 (Ala. 1994).  "Where the representation of an opinion is involved, a person must prove not only that there was an intent to deceive, but also that his reliance was reasonable." *Reynolds v. Mitchell,* 529 So. 2d 227, 231 (Ala. 1988) (citing *Bedwell Lumber, Inc. v. T & T Corp.,* 386 So. 2d 413 (Ala. 1980)).

McCutchen Co., Inc. v. Media General, Inc., 988 So. 2d 998, 1002 (Ala. 2008).  At best, the statement, "Don't worry about it," is nothing more than Jackson's opinion or prediction about future events.  At the time the statement was made in late March, credit approval was in place with Bank of America and was not the source of anything to worry about.  As to what would happen at the end of May, the statement is nothing more than a prediction about a future event.  Under neither circumstance can it support a claim of fraud under § 6-5-101.  Further, there certainly is no evidence

that Jackson had an intent to deceive the plaintiffs; he truthfully told them about the credit approval by Bank of America and informed them of the 60-day approval period.  As Chris testified, he was aware the credit approval would expire on June 2, even if he had never seen the credit-approval letters themselves.

Even if the court assumes the plaintiffs are attempting to assert a promissory fraud claim, the evidence does not support it.  "A claim of promissory fraud is 'one based upon a promise to act or not to act in the future.'"  Ex Parte Michelin North America, Inc., 795 So. 2d 674, 678 (Ala. 2001) (quoting Padgett v. Hughes, 535 So. 2d 140, 142 (Ala. 1988)).  It is argued that Jackson's "Don't worry about it" statement was a promise by Bankston that it would obtain financing for the plaintiffs if the existing financing expired on June 2, and that this was a promissory fraud.  As a statement made about a future intent, it was a promise to act in the future about obtaining financing for the purchase of the RV.  In addition to the four traditional elements of fraud discussed above, "[t]o prevail on a promissory fraud claim…, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive." Padgett at 142; Waddell & Reed v. United Investor's Life Insurance Co., 875 So. 2d 1143, 1160 (Ala. 2003).  As mentioned, there was absolutely no evidence that the defendant did not intend to perform the act promised.  At the time the statement was made by Jackson, Bankston already had secured financing for the plaintiffs.  Common sense demonstrates that both plaintiffs and defendant wanted the purchase of the RV to occur; otherwise both plaintiffs and defendant would lose money.   Bankston wanted the purchase of the RV to happen just as much as the plaintiffs, and if Bankston was merely deceiving the plaintiffs, the purchase would never be finalized because the plaintiffs would not have the requisite

financing.  Because it would make no economic sense to falsely and deceitfully promise to secure

financing with no intention to do so, the undisputed evidence simply does not support the conclusion

that Bankston, through Jackson, had the no intention to perform the "promise" to obtain financing

for the plaintiffs.  The evidence is more than clear that Bankston wanted to and believed it could

obtain financing for the plaintiffs.  The fact that it failed does not prove that it never intended to

fulfill the "promise."  There is no actionable claim for promissory fraud.

Plaintiffs also contend that Bankston fraudulently suppressed the fact that no financing was

in place after June 2, when the plaintiffs traveled to Huntsville to complete the sale on June 16, 2009.

In effect, they contend they were induced to make the trip to Huntsville because Bankston

fraudulently suppressed the fact that the Bank of America financing expired on June 2.[6]   To state

a fraudulent suppression claim, the plaintiff must allege and offer substantial evidence of "(1) a duty

on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by

the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury."

DGB, LLC v. Hinds, 55 So. 3d 218, 231 (Ala. 2010), quoting Freightliner, L.L.C. v. Whatley

Contract Carriers, L.L.C., 932 So. 2d 883, 891 (Ala. 2005)(quoting Lambert v. Mail Handlers

Benefit Plan, 682 So. 2d 61, 63 (Ala. 1996)).  Further, "without a duty to disclose, there can be no

---

[6]  Plaintiffs certainly cannot assert a claim that they were induced to get married, take early retirement, buy a car and additional equipment for the RV, and list their Ohio home for rent due to a fraudulent suppression by Bankston.  First, Bankston suppressed nothing.  Plaintiffs were told that financing had been arranged and that it would expire near the end of May.  Despite knowing of the potential expiration of the financing, plaintiffs took all the actions they now claim as damages fully aware that the financing could expire.  Indeed, expressing a concern to Jackson that transaction had to be completed before it expired.  The plaintiffs did not rely on Bankston's silence in making these decisions.  Thus, the only "silence" that might conceivably amount to fraudulent suppression was Bankston's failure to tell the plaintiffs *after* June 2 that the financing had expired.  The only thing the evidence reveals the plaintiffs did in arguable reliance after that date, however, was making the trip to Huntsville.  Everything else occurred before.

recovery for suppression." Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So. 2d 883, 891 (Ala. 2005). Whether a "duty to disclose" exists is a question of law for the court, not the jury. Id., citing Armstrong Business Services, Inc. v. AmSouth Bank, 817 So. 2d 665, 676-77 (Ala. 2001). In making that decision of law, the Alabama Supreme Court has instructed courts to apply certain factors, as follows:

> In *Armstrong Business Services,* this Court stated:
>
>> "The trial court must consider and apply the following factors in determining whether, under the particular circumstances, a duty to disclose exists: '(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.'"
>
>> 817 So. 2d at 677 (quoting *State Farm Fire & Cas. Co. v. Owen,* 729 So.2d 834, 842-43 (Ala. 1998)). Additionally, this Court has stated: "A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent....
>
>> "....
>
>> "This Court has stated that whether one has a duty to speak depends upon a fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case.... When the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested."
>
> *Mason v. Chrysler Corp.*, 653 So. 2d 951, 954-55 (Ala. 1995).

Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C., 932 So. 2d 883, 891-92 (Ala. 2005).

Applying these factors to the evidence in this case, the court concludes that Bankston had no duty to disclose to the plaintiffs that financing had expired before the plaintiffs traveled from Ohio to Huntsville to close the deal on June 16.  First, the relationship between the parties was an arm's-length commercial transaction, not involving any fiduciary duty on Bankston's part.  Second, Chris Marshall was already aware that financing would expire at the end of May; he himself had pointed this out to Jackson.  Plaintiffs certainly had the opportunity to ascertain the fact that financing had expired before they left Ohio to travel to Huntsville.  Although they called Jackson the day before they left for Huntsville, there is no evidence that they asked him whether financing was still in place.  While that fact was certainly important to the plaintiffs' decision whether to drive to Huntsville, there is no evidence of any particular "usage of trade" that would have required Bankston to disclose the expiration of the Bank of America financing.  Indeed, Bankston had every reason to believe that Chris already knew this.  These factors all indicate that Bankston had no duty to disclose the fact that the Bank of America financing approval expired on June 2.  Absent a duty to disclose, there can be no fraudulent suppression.

Even assuming that Bankston had a duty to tell the plaintiffs that the financing had expired on June 2 before they traveled to Huntsville from Ohio, the only damages that occurred due to the non-disclosure related to the expenses of the trip itself, which Bankston reimbursed to plaintiffs when the deal fell through.  All of the other elements of damage claimed plaintiffs — their getting married, Kay taking early retirement, buying a car and extra equipment for the RV, and arranging to rent their Ohio home — occurred before the financing expired.  Plaintiffs did not rely on any fact not disclosed to them by Bankston in taking these actions or making these decisions.  Plaintiffs also agree that when the deal fell through, Bankston refunded their down payment on the RV, paid for

the satellite system they bought, and reimbursed them for the night they spent in a hotel while in Huntsville.  Plaintiffs suffered no economic injury due to making the trip.  Neither lost income, because both were then retired.  There simply is no showing that the plaintiffs suffered a compensable injury due to Bankston's failure to disclose the fact that the Bank of America financing expired on June 2 before the plaintiffs drove to Huntsville.

For these reasons, plaintiffs cannot prevail on a fraudulent suppression theory.  When they decided to proceed with the purchase, financing was approved.  Thereafter, in this arm's length transaction, Bankston had no duty either to secure financing for the plaintiffs or disclose to them something they already knew, that financing would become unavailable at the end of May.  There simply is no fraud.  Bankston was as surprised and disappointed as the plaintiffs that Bank of America would not reapprove their credit.  Bankston made no misrepresentations or deceitful promises about credit for the plaintiffs.

<u>CONCLUSION</u>

Based upon the foregoing undisputed facts and legal conclusions, the motion for summary judgment is due to be granted in full and all claims by the plaintiffs are due to be dismissed.  To the extent that the motions seek other relief, they are due to be denied.

A separate order will be entered.

Done the 8th  day of February, 2013.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

32